**THE A/S GLITTRE, Plaintiff,**

v.

**Robert W. DILL, Collector of Customs, Port of New York, Defendant.**

United States District Court
S. D. New York.
April 12, 1957.

Haight, Gardner, Poor & Havens, New York City, Walter A. Darby, Jr., New York City, of counsel, for plaintiff.

Paul W. Williams, U. S. Atty., for Southern District of New York, New York City, Burton S. Sherman, Asst. U. S. Atty., New York City, of counsel, for defendant.

HERLANDS, District Judge.

Whether the doctrine of economic duress applies to the facts of this case is the question presented by plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment.

In this action, commenced on December 21, 1955, plaintiff seeks to recover a $1,000 fine paid to defendant under the Immigration Act of 1924 (8 U.S.C.A. § 167 and 8 C.F.R. 160.14). Plaintiff, the owner of the motor-vessel Ferncape, is a Norwegian corporation. Defendant is the Collector of Customs for the Port of New York.

On August 26, 1954, the District Director of Immigration and Naturalization Service served upon plaintiff's agent, Dichmann, Wright & Pugh, Inc., a Notice Of Intention To Fine Under Immigration And Nationality Act (Exhibit C attached to plaintiff's moving affidavit; Exhibit 6 attached to defendant's opposing affidavit).

The violation for which the imposition of a $1,000 fine was indicated in 1954 had taken place in April or May, 1948. The violation consisted of plaintiff's "failure to detain on board vessel and deport" an alien seaman, Salvatore Alongi, who had arrived on the Ferncape at the port of Norfolk, Virginia.

The Notice Of Intention To Fine contained, *inter alia,* the following provisions: (1) plaintiff's agent was granted thirty days to file a written defense "setting forth the reasons why a fine should not be imposed or if unpaid, why it should be mitigated or remitted"; (2) plaintiff's agent was given the opportunity for a "personal interview," the privilege of having counsel present, and of "presenting evidence" and submitting a brief in support of its contentions; and (3) "The vessel * * * on which the alien * * * arrived will be granted clearance papers when ready to depart and allowed to proceed upon the outward-bound voyage on condition that you deposit with the collector of customs at this port, prior thereto, the sum

of One Thousand dollars, or, where permitted by the Immigration and the Nationality Act, a bond with sufficient surety to secure the payment of the fine should it be imposed."

The evidence establishes that the Immigration and Naturalization Service duly notified plaintiff in writing, on April 16, 1948, to detain on board the Ferncape at all United States ports, a certain alien seaman, one Salvatore Alongi (Exhibit 1 attached to opposing affidavit of Burton S. Sherman). Alongi had been deported from the United States on or about February 10, 1940, as a narcotics peddler, with a record of a number of convictions under the Federal narcotics laws.

For the purpose of these motions, plaintiff admits "that the Collector of Customs was entitled to assess a fine" (moving affidavit of Walter A. Darby, Jr., p. 2); and "that had the United States proceeded in timely fashion, it would have been an offense for which the Ferncape, or its owners, would be subject to the possibility of paying a fine" (replying affidavit of Walter A. Darby, Jr., p. 1).

On April 20, 1948, the Ferncape sailed from Newport News, Virginia, bound for New York. On April 21, 1948, the New York District Director of Immigration and Naturalization was officially notified to detain Alongi on board the Ferncape upon its arrival in New York. When that vessel arrived in New York, plaintiff was ordered to detain Alongi on board the vessel.

While the Ferncape was in the Port of New York, Alongi jumped ship. On May 17, 1948, the Immigration and Naturalization Service was notified of that fact.

It was not until March 12, 1954, that Alongi was located and arrested. When questioned, he admitted that he had jumped ship in 1948.

At the time of Alongi's apprehension on March 12, 1954, administrative proceedings had not been instituted to fine plaintiff for its failure to detain Alongi on board the Ferncape.

After receiving the Notice Of Intention To Fine, dated August 26, 1954, plaintiff's agent posted a $1,000 bond in favor of the United States of America, pursuant to 8 U.S.C.A. § 1284, and Immigration Regulations 8 C.F.R. 160.14. The bond was delivered to the Collector of Customs on September 24, 1954. This bond is entitled: "Bond For Payment Of Sums and Fines Imposed Under Immigration Act of May 26, 1924" (Exhibit 7 attached to defendant's opposing affidavit). Plaintiff's agent executed this bond as principal. The National Surety Corporation executed the bond as surety.

On September 24, 1954, when the bond was delivered, the vessel was in the Port of New York.

The bond contains, *inter alia*, the following recitals:

"Whereas, the owner, master, agent * * * of the said vessel may incur liability for fines * * * imposed by the Attorney General pursuant to the provisions of sections 16, 20, and/or 26 of the Immigration Act of 1924 in connection with aliens brought to the United States on the said vessel; and

"Whereas, under the said Immigration Act no vessel shall be granted clearance pending the determination by the Attorney General of the question of such liability or while such fines remain unpaid, provided that clearance may be granted prior to the determination of such question upon the deposit of an amount sufficient to cover such fines, or of a bond with sufficient surety to secure the payment thereof approved by the Collector of Customs;

"Now, Therefore, the condition of this obligation is such, that if the above-bounden principal shall pay to the Collector of Customs of the said port any and all fines imposed by the Attorney General under the said sections of the said Act against the owner, master, agent * * * of the said vessel; then this obligation shall be void, otherwise it shall remain in full force and effect; the

said principal to have, however, the privilege of making such payments under protest, and without prejudice to any and all legal rights of recovering by appropriate action or proceedings any and all sums paid under this bond."

On September 24, 1954 (when both plaintiff's agent and the National Surety Corporation assumed an obligation on the bond) they knew that the Notice Of Intention To Fine was based upon a violation of Section 20 of the Immigration Act of 1924, which had taken place in April or May 1948.

On October 21, 1954 (pursuant to Immigration Regulations 8 C.F.R. 160.14 et seq.) plaintiff filed a protest to the imposition of the fine with the District Director on the ground that "the applicable statute of limitations had run" and that the fine should not be imposed (complaint, paragraph Fifth).

On November 5, 1954, the District Director denied plaintiff's protest and ordered the imposition of the fine.

On November 12, 1954, plaintiff appealed to the Board of Immigration Appeals.

On April 15, 1955, the Board of Immigration Appeals dismissed plaintiff's administrative appeal from the District Director's decision and ordered imposition of the fine.

In its decision (Exhibit 8 annexed to defendant's answering affidavit), the Board of Immigration Appeals rejected as "not valid" plaintiff's contention that 28 U.S.C.A. § 2462 completely bars any enforcement by the Government of the fine. The Board's opinion, distinguished between (1) an affirmative suit by the Government to collect the fine, as to which suit the statute of limitations "*may* have run against the Government"; and (2) a formal finding that the detention order had been violated and that the statutory fine should be imposed. As to the latter, the Board took the position that the statute of limitations did not preclude such findings and imposition; nor did it prevent the Government from resorting to means—other than an affirmative suit—to collect the fine, such as by way of an offset against funds which might be due from the Government to the claimant.

On April 26, 1955, defendant notified plaintiff's agent that, on April 15, 1955, the Department of Justice had imposed a fine of $1,000. This notice stated:

"Inasmuch as the law requires full payment of the imposed fine before clearance of the vessel * * * may be granted, prompt payment of this amount is requested" (Exhibit A attached to moving affidavit of Oakley Wood; Exhibit 9 attached to opposing affidavit of Burton S. Sherman).

This was the first notice to collect the fine.

On May 10, 1955, defendant notified plaintiff that if the fine "is not paid on or before May 20, 1955, the facts pertaining to the matter will be reported to the United States Attorney for appropriate action" (Exhibit 10 attached to the moving affidavit of Burton S. Sherman). This was the second notice to pay.

On May 16, 1955, plaintiff forwarded to defendant its check in the amount of $1,000. Plaintiff's letter of transmittal stated that the check represented "payment of the Immigration fine" and that "the fine is being paid under protest, and without prejudice to the vessel's rights to institute court proceedings in order to test the legality of the United States Immigration Board of Appeals decision" (Exhibit 11 attached to the opposing affidavit of Burton S. Sherman; Exhibit B attached to the moving affidavit of Oakley Wood). The bond was cancelled and discharged by the Collector of the Port on June 6, 1955.

According to the complaint (paragraph Ninth) the fine was paid "for the sole purpose of insuring said clearance papers when the MV/Ferncape next arrived in a United States Port and to avoid detention of the vessel and permit her departure thereby avoiding great

and irreparable damage." The gravamen of the complaint (paragraph Tenth) is that the fine was illegal because it "was outlawed by the applicable Statute of Limitations" at the time it was imposed. Plaintiff relies upon the five year statute of limitations contained in 28 U.S.C.A. § 2462:

"Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon."

On May 16, 1955, when the $1,000 was paid by plaintiff, the Ferncape "was en route from Barbados to Montreal" (plaintiff's answer No. 3 to defendant's interrogatories). The vessel had left Barbados on May 16th and arrived in Montreal on May 24, 1955. At the time the fine was paid, plaintiff's agent knew that the vessel was bound north along the Atlantic Coast.

From May 16, 1955, to January 1, 1956, the Ferncape was not in the Port of New York. Since May 16, 1955, the Ferncape has been within the territorial waters of the United States on two occasions: in Mobile, Alabama on September 7, 1955, and in Tampa, Florida, on September 12, 1955. The vessel has been *in San Juan, Puerto Rico on June 22,* July 16, August 14, October 11 and December 7, 1955 (plaintiff's answer No. 5 to defendant's interrogatories). The term "United States," when used in the geographical sense, includes Puerto Rico (8 U.S.C.A. § 501); Immigration and Nationality Act, section 1101, paragraph (a) (38), 8 U.S.C.A.

In point of fact, it thus appears:

(1) The decision of the Board of Immigration Appeals on April 15, 1955, affirming the imposition of the fine, was rendered more than two months before the Ferncape docked in the "United States" at San Juan, Puerto Rico, on June 22, 1955. On April 15, 1955, the vessel was at Istanbul, Turkey.

(2) At the time of the first collection notice of April 26, 1955, the vessel was en route from Palermo, Italy, to Demerara, British Guiana. This was fifty-seven days before the vessel docked at San Juan, Puerto Rico.

(3) At the time of the second collection notice of May 10, 1955, the vessel was at Trinidad. This was forty-three days before the vessel docked at San Juan, Puerto Rico.

(4) At the time when the fine was paid on May 16, 1955, the vessel was en route from Barbados to Montreal. This was thirty-seven days before the vessel docked at San Juan, Puerto Rico.

(5) At the time when the $1,000 fine was paid on May 16, 1955, plaintiff knew that the very first time the vessel would thereafter dock at any "United States" port (San Juan, Puerto Rico) would be June 22, 1955, thirty-seven days later.

### I.

■ The foregoing facts demonstrate not merely that the $1,000 payment by plaintiff was voluntary, considered in terms of the weight of the evidence, but more importantly that there was no duress or coercion as a matter of law.

The $1,000 was paid on May 16, 1955, about *five weeks before* the vessel docked in San Juan. If, *arguendo,* it be assumed that plaintiff could justifiably act on the supposition that the Collector of the Port of San Juan would deny clearance at that port, that denial could not possibly occur, at the earliest, until June 22, 1955, the scheduled (and actual) date of arrival of the vessel at San Juan. Hence, plaintiff's payment was anticipatory. It was not induced by a present, immediate and urgent necessity, but by a desire to avert a prospective and contingent event which presumably might take place in five weeks.

■ To constitute duress, the demand must, among other things, create "an immediate and urgent necessity" for the

payment. See Union Pacific Railroad Co. v. Board of County Commissioners, 1878, 98 U.S. 541, 543–544, 25 L.Ed. 196; Cunard S. S. Co. v. Elting, 2 Cir., 1938, 97 F.2d 373.

In the Cunard case, supra, a stop order was issued against a vessel which was not in port at the time and was not expected in that port for six weeks. Payment was promptly made. In holding that the payment to obtain clearance for the vessel had been voluntary, the Court, per Judge Swan, said at page 378:

"In our opinion the mere issuance of the stop order against clearance of a vessel which was expected to arrive in port *six weeks later* would not render the *present* payment one made under duress." (Emphasis supplied.)

The law of voluntary payments was analyzed in Adrico Realty Corp. v. City of New York, 1928, 250 N.Y. 29, at pages 33–34, 164 N.E. 732, at page 733, 64 A.L.R. 1, where Judge Crane said that "the heart" of the rule is that, to make out duress or coercion, the payment must be made "through necessity and the urgency of the case," or "when the payment of money becomes necessary to obtain the *immediate* liberty of person or the possession of property," or "where *present* liberty of person or *immediate* possession of goods" cannot be deferred in favor of the alternative of effective legal proceedings. (Emphasis supplied.)

In his dissenting opinion in Cahill v. New York, N. H. & H. R. Co., 1956, 351 U.S. 183 at page 190, note 6, 76 S.Ct. 758, 763, 100 L.Ed. 1075, Mr. Justice Black, discussing "payment under duress," wrote:

" 'Where a party pays an illegal demand with a full knowledge of all the facts which render such demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment must be deemed voluntary and cannot be recovered back. And the fact that the party at the time of making the payment files a written protest does not make the payment involuntary.' Union Pacific Railroad Co. v. [Board of County] Commissioners, 98 U.S. 541, 543–544, 25 L.Ed. 196. See also Little v. Bowers, 134 U.S. 547, 554–558, 10 S.Ct. 620, 621–623, 33 L.Ed. 1016."

This is not a case of "economic duress" instanced by Circuit Judge Frank in his dissent in United States v. Johnson, 2 Cir., 1956, 238 F.2d 565, 574, note 17.

## II.

■ There are additional circumstances which leave no room for rational doubt that, in this case, there was no duress. One of the essential elements of duress—lacking in the present case— is that the demand be illegal. Union Pacific Railroad Co. v. Board of County Commissioners, supra; Cunard S. S. Co. v. Elting, supra. Williston on Contracts, Vol. V. (revised ed. 1937) section 1621, sums up the general rule as to duress with the question "whether the party induced to act was coerced by *wrongful* pressure * * *." (Emphasis supplied.) In In re Meyer, D.C.E. D.N.Y.1901, 106 F. 828, 831, the Court, in defining duress, said:

"What is duress? 'The duress for which a person may avoid any contract or conveyance made, or recover back any money paid under its influence, exists where one by the *unlawful* act of the beneficiary or his authorized agent, or by the act of some person with his knowledge, is constrained under circumstances which deprive him of the exercise of free will to agree or to perform the act sought to be avoided.' 10 Am. & Eng. Enc. Law, 321. This definition illustrates that the act which coerces the complaining person must have been an *unlawful* one, and so it should be. If one person exercises simply the right which the law gives him with reference to the person or property of another, it cannot be said that he unlawfully

940

coerces the other. Duress involves illegality." (Emphasis supplied.)

■ The fine imposed on plaintiff by the Collector was lawful.

8 U.S.C.A. § 1284 (formerly 8 U.S.C.A. § 167) provides:

"No such vessel or aircraft shall be granted clearance pending the determination of the liability to the payment of such fine, or while the fine remains unpaid * * *."

The running of the statute of limitations did not render the imposition of the fine and the attempt to collect it illegal, although the collection of the fine by affirmative action might have been avoided by the plaintiff through the appropriate interposition of the time-bar.

The material part of 8 U.S.C.A. § 167, Immigration Act of 1924 section 20 (as revised, now 8 U.S.C.A. § 1284, Immigration and Nationality Act of 1952) provides:

"The owner, charterer, agent, consignee, or master of any vessel arriving in the United States from any place outside thereof * * * who fails to detain such seaman on board after such inspection or to deport such seaman if required by such immigration officer or the Attorney General to do so, shall pay to the collector of customs of the customs district in which the port of arrival is located the sum of $1,000 for each alien seaman in respect of whom such failure occurs * * *."

The foregoing provision does not contain a statutory time condition as an essential ingredient of the cause of action for the $1,000 fine. A claim for the fine may, however, be barred by the running of the applicable statute of limitations contained in 28 U.S.C.A. § 2462.

■ There is a vital and well-recognized distinction between a statutory time condition and a statute of limitations. A statutory time condition operates as a limitation of the liability itself as created, and not of the remedy alone. Bowles v. American Distilling Co., D.C.S.D.N.Y.1945, 62 F.Supp. 20, appeal dismissed Porter v. American Dis-

tilling Co., 2 Cir., 1946, 157 F.2d 1012. See 53 C.J.S. Limitations of Actions § 1, pp. 904–905.

In the case at bar, the Collector acted pursuant to his statutory duty; his demand was not illegal. The plaintiff's obligation to pay the $1,000 was not "a nonexistent debt"; and there has been no "over-payment" to defendant. Cf. Dawson, Economic Duress—An Essay in Perspective (1947) 45 Mich.L.Rev. 253, 283; cf. Hardie and Lane v. Chilton (1928) 2 K.B. 306 (commented on in 42 Harv.L.Rev. 274 [1928]).

### III.

The sequence of events also clearly demonstrates that plaintiff had adequate time and opportunity to pursue available legal remedies as the alternative to making the payments.

■ (A) The plaintiff could have brought an action for declaratory judgment to determine the question of whether the fine had been legally imposed and whether the Collector of Customs could have denied clearance to the vessel. See 5 U.S.C.A. § 1009(a), (e), Administrative Procedure Act. An application for interim injunctive relief would have been in order.

In American President Lines, Inc., v. MacKay, D.C.D.C.1953, 120 F.Supp. 897, pursuant to regulations, the Immigration Service required the plaintiff-shipping company to deposit money in advance for detention expenses of aliens. Plaintiff, after making the deposit, contested the legality of the regulations by seeking a declaratory judgment. The Court held that an action for a declaratory judgment was a proper remedy to determine the legality of payments made by plaintiff, notwithstanding the fact that plaintiff also could sue in the Court of Claims for a refund.

It has been held that summary judgment may properly be granted when there is no genuine issue of fact or law raised by plaintiff's claim of economic duress, as where it has been demonstrated that plaintiff had an alternative, adequate and available legal remedy or that the loss of plaintiff's property was due to

plaintiff's own hasty or premature conduct. Christianson v. Gaines, 1949, 85 U.S.App.D.C. 15, 174 F.2d 534.

Similarly, it has been held that the availability of the Federal Declaratory Judgment Act, 28 U.S.C.A. § 400,* as a means of securing an adjudication of the particular controversy, was significant in determining that a payment made under protest by a person to protect a valuable contract had not been induced by duress of the other party to the controversy. Pure Oil Co. v. Tucker, 8 Cir., 1947, 164 F.2d 945.

On the other hand, where a person was required by an official agency to pay a fee for a certificate of authorization or else, as threatened by the agency, its mortgage bonds would be invalidated and it would be subjected to "grave penalties," the payment of the fee was deemed to have been "made under duress," in view of the fact that there was "no proceeding" available to the payor "by which it adequately could have avoided" the payment. Union Pacific Railroad Company v. Public Service Commission, 1918, 248 U.S. 67, 39 S.Ct. 24, 25, 63 L.Ed. 131, discussed in Thompson v. Deal, 1937, 67 App.D.C. 327, 92 F.2d 478, 485.

In the Thompson case, plaintiffs' payment for certain exemption certificates required under an invalid law was held to have been "exacted by coercion" because the purchase of such certificates was "immediately necessary" to the plaintiffs' business and they had no adequate alternative course to follow (92 F.2d at pages 481, 486).

(B) Another alternative open to plaintiff was to wait for the United States to bring an action on the bond and then for plaintiff to raise the parties' implied agreement as to the statute of limitations as an affirmative defense. United States v. Springer & Lotz, 2 Cir., 1934, 69 F.2d 819, 820. In the Springer & Lotz case, the Circuit Court of Appeals affirmed the District Court's dismissal of the Government's action upon a bond which had been posted by defendants, retail druggists, in connection with their application for a liquor permit while the Eighteenth Amendment was in force. The condition of the bond was that the defendants should pay all taxes and penalties "payable * * * under the National Prohibition Act * * * and other internal revenue laws." The bond was executed in July 1922. Shortly thereafter, defendants illicitly sold liquor. Ten years later, in 1932, the Government brought suit *on the bond,* seeking to recover the amounts of certain special taxes and penalties imposed under the National Prohibition Act and the Revenue Act. The District Court granted defendants' motion to dismiss the action on the ground that the statute of limitations applicable to penalties was a defense. Circuit Judge Learned Hand pointed out that, in affirming, the Circuit Court of Appeals did not agree with the District Judge's reasoning that the statute of limitations, as such, was a defense to the action on the bond. The affirmance was bottomed on the proposition that the penalties were no longer "payable" within the specific meaning and purpose of the particular bond's condition because the penalties could no longer be collected by virtue of the time-bar.

■ In the present case, the purpose of the bond was merely ancillary to the imposed fine. Its promise is to be read, *as the parties intended,* as conditioned upon the resolution of the controversy between them concerning the effect of the statute of limitations on the imposition of the fine. The statute of limitations by its own force would not apply to an action upon the bond because that action, as such, is not covered by the language of title 28 U.S.C.A. § 2462. But the statute of limitations could be pleaded as a defense to the action upon this bond because that was the parties' intention "by convention." Cf. United States v. Springer & Lotz, supra, at page 820.[1]

---

* Now 28 U.S.C.A. §§ 2201, 2202.

1. In Durning v. McDonnell, 2 Cir., 1936, 86 F.2d 91, 92, certiorari denied 1936, 300 U.S. 682, 57 S.Ct. 753, 81 L.Ed. 885, an action was brought by the Government upon a bond executed by the

The posting of the bond, in the present case, at a time when there was a bona fide controversy between the parties as to whether the statute of limitations had run, was specifically designed to preserve in status quo the mutual legal rights of the parties and, at the same time, to enable plaintiff to use its vessel while protecting the Government if it had a valid claim to the fine. Cf. United States v. Mack, 1935, 295, U.S. 480, 484, 55 S.Ct. 813. If, at the time the bond was posted, the Government's claim for the fine was outlawed by the statute of limitations, as it was, the posting of the bond for the purpose of preserving the rights of the parties did not constitute a waiver of the defense of the statute of limitations.

## IV.

The uncontradicted evidence establishes that plaintiff's assumption—that a stop order had been sent to the Collector of Customs for the Port of San Juan —was factually erroneous. The first notice that the fine had been administratively imposed plainly stated that the notice was from the Collector of Customs of the Port of New York. The notice recited that, unless the fine were promptly

general agents of a steamship line, as principals. The bond had been executed in 1924. It was conditioned upon payment to the Collector of Customs of all fines imposed against any vessel by reason of the violation of any of certain provisions of the Immigration Act of 1924 (including 8 U.S.C.A. § 167) for the payment of which the said principals shall be "determined" to be liable. In 1928—four years after the bond had been given—the Secretary of Labor imposed fines on the defendants with respect to the improper admission of three aliens transported on defendant's vessel. The action on the bond was commenced more than five years after the fines had been posed.

Circuit Judge Swan held that the five-year statute of limitations (which barred an action to recover the fines themselves as a statutory liability) did not bar this action on the bond because (1) the condition of the bond was to pay fines for which the defendants "shall be determined to be liable"; (2) when the Secretary of Labor imposed the fine, he "determined" the defendants' liability within the meaning of the bond; and (3) the statute of limitations does not run against the promise contained in the bond. Judge Swan pointed out that the "correctness" of the Secretary of Labor's determination of the fine was subject to judicial review in the action on the bond because the bond secured "only valid fines" and if there were none, it was not forfeited.

The Durning case indicates that each such case (of an action on the bond) is determined by the language and purpose of the bond and that the coverage of the bond is the decisive feature.

The problem of the relationship between the obligation on the bond and the original obligation in connection with which the bond is given is illustrated in United States v. Mack, 1935, 295 U.S. 480, 55 S.Ct. 813, 79 L.Ed. 1559. In the Mack case, the Court upheld an action on a bond brought by the Government in view of the language of the condition contained in the bond (295 U.S. at page 482, note 1, 55 S.Ct. 813). In that case, a motor boat carrying a cargo of intoxicating liquors in violation of the National Prohibition Act was seized by the Collector of the Port of New York, and the crew were arrested. The alleged owner of the boat posted a bond conditioned "that the bond should be void if the vessel was returned to the custody of the collector on the day of the criminal trial to abide the judgment of the court." (295 U.S. at pages 481–482, 55 S.Ct. at page 814.)

The crew pleaded guilty and were sentenced. But the vessel was not returned by the owner to the Collector. The Government brought an action on the bond. Defendants contended that, through the Twenty-first Amendment's repeal of the Eighteenth Amendment liability on the bond had ended.

The Supreme Court held that the bond, being a contract, is to be enforced according to its terms; that defendants' liability became complete upon the breach of the express condition for the return of the vessel; and that the perfected liability on the bond was not extinguished by the fact that the Government could no longer proceed criminally against the vessel. Mr. Justice Cardozo analyzed the initial purpose of the bond (295 U.S. at page 484, 55 S.Ct. at page 815).

It has been indicated that, in an action upon a bond such as the bond in the present case, "the obligor can raise the invalidity of the fine." Judge Learned Hand in Bank Line v. United States, 2 Cir., 1938, 96 F.2d 52, 54.

paid, the ship would be denied clearance. This meant clearance in the Port of New York. The Collector of Customs of New York has no authority to deny clearance in San Juan, Puerto Rico.

The applicable Immigration Regulations (8 C.F.R. 280.11, 8 C.F.R. [1947 Supp.] 160.16. and 8 C.F.R. [Revised 1952] 280.15) provide that the Notice of the Imposition of the Fine (Defendant's Exhibit 9) is sent to the same Collector of Customs who was first notified (by the Immigration and Naturalization Service) of the Notice of Intention to Fine (Defendant's Exhibit 6). The Collector may then deny clearance to the vessel involved. If the vessel is located in a different customs district, there is a requisite procedure to notify the Immigration and Naturalization Service and Collector of Customs for that other district. But that procedure can be activated only when the Government knows where the vessel is located—a fact not appearing in this case.

In the present case, the Collector of Customs was the Collector of Customs of the Port of New York. It must be presumed that the agent of the plaintiff, a well-known and large shipping company agency, had knowledge of this regulation. If not, a telephone call to the Collector of Customs of the Port of New York would have revealed that no stop order had been sent to the Collector of Customs of San Juan, Puerto Rico or to any port other than New York.

Plaintiff acted upon the unverified and erroneous assumption that there was a stop-order awaiting the vessel in San Juan.

■ The rule is that if by reasonable diligence one, under a legal duty to do so, can obtain knowledge of a fact and fails or neglects to do so, and thereafter pays money to discharge a legitimate debt, he cannot require its return as having been paid under a mistake of fact or under a misapprehension.

■ The mere fact that a person is in fear of some impending peril or injury or in a state of mental perturbation at the time of doing any act, is not sufficient ground for holding that the act was done under duress.

Plaintiff's motion is denied. Defendant's motion is granted. Settle order on notice.